## PENNSYLVANIA R. CO. v. LOGANSPORT LOAN & TRUST CO.

Circuit Court of Appeals, Seventh Circuit.
November 23, 1928.

No. 4073.

Russell P. Harker, of Frankfort, Ind., for appellant.

Tinkham & Galvin, of Hammond, Ind., and Herbert H. Patterson, of Chicago, Ill., for appellee.

Before ALSCHULER, EVAN A. EVANS, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. Appellee, as administrator of the estate of Harry Zimmerman, deceased, brought suit in the court below for damages for the death of Zimmerman, resulting from injuries received while working as a member of one of appellant's switching crews in its yards at Logansport, Indiana.

The complaint is in four paragraphs, the first, third and fourth alleging that at the time of the injury appellant was a common carrier by railroad engaged in interstate commerce and that Zimmerman was in appellant's employ and also engaged in interstate commerce. The second paragraph did not allege employment in interstate commerce.

The averments as to appellant's negligence differ somewhat in the four paragraphs, but each states as the cause of the injury the absence of appliances required by the Safety Appliance Act (45 USCA § 1 et seq.).

The principal question argued at the hearing and discussed in the briefs was whether or not Zimmerman, at the time of

the injury, was engaged in interstate commerce. This question was submitted to the jury upon instructions which were not excepted to, and the jury returned a verdict for the plaintiff. No motion to direct a verdict because of insufficient evidence was made; but it is now insisted that the evidence fails to show employment in interstate commerce, and hence that the employment was intrastate as a matter of law.

■ If the question is saved it comes to this: Was there evidence before the jury sufficient to warrant a finding that Zimmerman, at the time of the injury, was engaged in interstate commerce?

There was evidence to the effect that appellant maintained at Logansport yards A, B, and C, and in yard A tracks numbered 47 and 57; that there was upon track 47 a number of defective cars, the twenty-seventh one of which was not equipped with couplers such as are required by the Safety Appliance Act, and which was chained to the car next to it, and it was desired to take this defective car out of track 47 and over to yard B to be repaired; that the engine was coupled to these 27 cars and they were pulled out upon a lead track, where the defective car was to be unchained and the other 26 cars returned to track 47; and that the engine and crew were then to take this defective car over to track 57 and there couple or fasten it to the cars on that track and proceed west with all of them, dropping the defective car at yard B and taking the cars from track 57 over to yard C; and that in going from yard A to yard B, and from B to C, it was necessary to pass over a part of the main track.

There was also evidence that the cars at that time on track 57 came from places outside of Indiana. One witness testified that the cars on track 57 "were from all directions; from the east end or possibly from the north; that Bradford Junction is the next division point east; * * * in Ohio." Another witness testified that "the cars on track 57 came from everywhere out of west bound trains; that track 57 was used *at that time* for what we call Peoria stuff going into Illinois, from trains from Ohio and other points east."

After the 27 cars were pulled out upon the lead line in order to disconnect the defective car (the twenty-seventh car), it was necessary for Zimmerman and another member of the crew to go between the cars to unfasten the chains. The other cars ran down upon the defective car and the two men were crushed because there were not couplers on the defective car to permit the disconnection without going between the cars. Later in the day the cars on track 57 were taken over to yard C to be carried on to their destination.

There was therefore evidence to sustain this state of facts—that Zimmerman lost his life while participating in a movement which comprehended taking the defective car from track 47 over to track 57, and there coupling it to the cars on track 57, and then taking the cars thus coupled together over a part of the main line on west, dropping the defective car at yard B and delivering the cars from track 57 to yard C.

The evidence above quoted is sufficient upon which to base a finding that the cut on track 57 was composed of interstate cars, and that Zimmerman was "engaged in interstate transportation or in work so closely related to it as to be practically a part of it." Shanks v. Delaware, L. & W. R. R. Co., 239 U. S. 556, 558, 36 S. Ct. 188, 189, 60 L. Ed. 436, L. R. A. 1916C, 797. At the time he received his injuries he had entered upon and was engaged in a movement of the engine and crew which involved and embraced the moving of interstate cars in interstate transportation. This brought the case within the Employers' Liability Act. 45 USCA §§ 51-59.

■ The judgment should be sustained whether Zimmerman at the time was engaged in interstate commerce or not. He received his injury because of noncompliance with the Safety Appliance Act. The case of Texas & Pacific Ry. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874, would sustain the verdict upon the second paragraph of the complaint. In that case Rigsby, a switchman in the yards of the railroad, was engaged with others of the yard crew in taking some "bad order" cars to the shops, there to be repaired. The engine and crew went upon a spur track, hauled out three cars, and switched them upon the main line, intending to go back upon the spur track for others to be taken with the three to the shops. Rigsby, in the course of his duties, in descending from one of the cars fell, owing to a defect in one of the handholds or grab irons, and sustained personal injuries. The defective car had been out of service and on the track for some time, and the taking of it and other bad order cars was in no way connected with any movement in interstate transportation. It was argued that Rigsby was not under the protection of the Safety Appliance Act, because at the time he was injured he was not engaged in interstate commerce. The court rejected this contention, saying: "That the

scope of the legislation [the Safety Appliance Act] is broad enough to include all employees thus injured, irrespective of the character of the commerce in which they are engaged, is plain." A recovery by Rigsby for the injuries thus received was upheld.

Appellant concedes that under the Rigsby Case an employee has a right of action for personal injuries for a violation of the Safety Appliance Act, but argues that the right of action is implied, that is, implied from the common law, and that, as an action for death did not survive at common law, the right of action for death resulting from a violation of the Safety Appliance Act cannot be so implied. This contention is fully answered by the case of Ross v. Schooley (C. C. A.) 257 F. 290, decided by this court.

The jury, under instructions not objected or excepted to, found a verdict for the plaintiff in the sum of $25,000, and provided that it should be apportioned $15,000 to the widow and $10,000 to the daughter of the deceased. This apportionment was unwarranted and may be treated as surplusage. It evidently was so regarded, as the court entered judgment simply for $25,000.

Affirmed.